IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| FRANCES SUZANNE DEVICO,<br><br>    Plaintiff,<br><br>       v.<br><br>GENESIS HEALTHCARE, LLC, et al.,<br><br>    Defendants. | Civil No. 17-7556 (RMB/JS)<br><br>**OPINION** |

APPEARANCES:

LAW OFFICE OF RHONDA E. GREENBLATT
By:  Rhonda E. Greenblatt, Esq.
222 New Road, Suite 302
Linwood, New Jersey 08221
       Counsel for Plaintiff

LITTLER MENDELSON, P.C.
By:  Kristine Grady Derewicz, Esq.
    Rachel Fendell Satinsky, Esq.
    Greg H. Greubel, Esq.
1601 Cherry Street, Suite 1400
Philadelphia, Pennsylvania 19102
       Counsel for Defendants

**BUMB, UNITED STATES DISTRICT JUDGE:**

    Plaintiff Frances Suzanne Devico brings this employment suit asserting various violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 ("ADA"), and other state law claims.

Defendants, Genesis Healthcare, LLC; Genesis Healthcare, Inc.; 144 Magnolia Drive Operations, LLC[1]; David Kinder, and Lois Hellmig, move for summary judgment. On November 22, 2019 the Court held oral argument. As became clear during the argument, much of what Plaintiff has argued is just that, argument. The Court has poured over the record, and it is not the record Plaintiff avers it to be. Thus, the Court has taken great care to "stick with the facts"-- particularly the undisputed facts. Having conducted such inquiry, and for the reasons set forth herein, Defendants' motion will be granted as to the federal law claims (<u>i.e.</u>, the ADA claims)[2], and the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

## I.  <u>Facts</u>

Since 2004, Plaintiff had been working as a Licensed Practical Nurse at Court House Center. (Defendants' Statement of Undisputed Material Facts ("DSUMF"), ¶¶ 20-21)  Court House Center is a short-term and long-term healthcare facility which provides care for elderly residents, including residents with dementia. (Id. ¶¶ 1, 22)

---

[1]  Defendants assert that 144 Magnolia Drive Operations, LLC employed Plaintiff but that Genesis HealthCare Inc., has "an indirect ownership interest in 144 Magnolia Drive Operations LLC." (Moving Brief, p. 1, n. 1)  Throughout the briefing, the parties refer to "Genesis" as Plaintiff's employer.  For the purposes of this opinion, the Court will also refer to Plaintiff's employer as "Genesis."

[2]  The Court has federal question subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331.

Genesis "began operating" Court House Center on May 14, 2014. (Id. ¶ 2).  At that time, Defendant Lois Hellmig, the Director of Nursing, became Plaintiff's supervisor, and Defendant David Kinder became the Center's Administrator.  (Id. ¶ 12)  Neither Defendant Hellmig, nor Defendant Kinder worked at Court House Center before May 14, 2014. (Id.)

Approximately three weeks later, on the morning of Monday, June 9, 2014, Plaintiff "became ill" while working her shift at the Center.  (Defs' Exs. A5, A6; Devico Dep. p. 96, 100, 113-14)  At the time, Plaintiff was doing a "med pass"-- i.e., distributing medications, including narcotic medications, to patients from a push cart.  (Defs' Exs. A5, A6; Devico Dep. p. 36-37, 96)  Another nurse working on the floor, Valarie Simuel, "noticed that [Plaintiff] didn't look well."  (Defs' Ex. A5; DSUMF ¶ 45)  Ms. Simuel observed that Plaintiff's "speech was slurred," and asked Plaintiff if she was okay.  (Id.)  Plaintiff complained of being "dizzy" and had to sit down.  (Id.; Devico Dep. p. 96, 100)  Ms. Simuel summoned another nurse, Jinal Patel, to help.  (Defs' Ex. A5; DSUMF ¶ 45)  Ms. Patel saw that Plaintiff was unable to continue working at that point, so Ms. Patel notified Defendant Hellmig.  (Defs' Ex. A5; Devico Dep. p. 114)  Plaintiff testified that, at some point during or just before Ms. Simuel and Ms. Patel came to help, Plaintiff "vomited twice."  (Devico Dep. p. 96)

Ms. Patel "informed [Defendant Hellmig] that Ms. Devico appeared to be impaired or intoxicated." (Helmig Decl. ¶ 19[3]) Defendant Hellmig then "went to check on [Plaintiff]" and observed Plaintiff to be "impaired or intoxicated." (Id. ¶¶ 20-21) Specifically, Defendant Hellmig observed Plaintiff "to have slurred speech, eyes [sic] were drooping and she was not able to keep her thought processes together." (Defs' Ex. A3) Pursuant to Genesis' written policy, Defendant Hellmig directed Plaintiff to immediately submit to a "reasonable suspicion" urine screening[4], to which Plaintiff consented. (Helmig Decl. ¶ 22; Defs' Exs. A2, A3; Devico Dep. p. 176) Plaintiff testified that she told Defendant Hellmig at that time, "it would be a positive read on [my] urine test" because Plaintiff had taken her prescription medication over the weekend, when she was not at work, and "that the medicine . . . can last in your system for seven days." (Devico Dep. p. 179) Plaintiff further testified that she did not tell Defendant Hellmig the specific prescription drugs she had taken because it was so

---

[3] The only deposition testimony in the summary judgment record before the Court is Plaintiff's deposition. Defendants Hellmig and Kinder have provided declarations in support of their motion for summary judgment. If those Defendants were deposed, Plaintiff has not provided their deposition testimony, nor the testimony of any other witness besides Plaintiff, to contradict the declarations.

[4] Genesis' policy states that "under certain circumstances," including when Genesis has "reasonable suspicion" of drug or alcohol use, an "existing employee" will be "require[d]" "to undergo" "drug/alcohol testing." (Defs' Ex. A2)

difficult for her to talk, but she did say "it could have been my blood pressure pill." (Devico Dep. p. 180, 175)[5]

The immediate "initial screen results" of the test were "non-negative"[6] for "opiates/morphine," "benzodiazepine," and "oxycodone." (Defs' Ex. B8) Defendant Hellmig "informed [Plaintiff] of the results and suspended her." (Hellmig Decl. ¶ 24)[7] Pursuant to Genesis' policy, Plaintiff's urine sample was "sent out" for further testing by a Medical Review Officer ("MRO"). (DSUMF ¶¶ 72-73; Hellmig Decl. ¶ 25; Defs' Ex. A2)

At about this time, another Genesis nurse, Casi Golaszewski, "encountered [Plaintiff] in the front office of [the Center]." (Defs' Ex. A5) Ms. Golaszewski "noticed [Plaintiff] appeared very drowsy[,] . . . her speech [was] sluggish, and her facial expressions and hand movements were slow and purposeful. . . . She appeared to be having a difficult time understanding [Golaszewski's] responses." (Id.) Shortly thereafter, Ms. Golaszewski saw

---

[5] At Plaintiff's deposition, however, she explained that she believes her test results were positive because of her "BuTrans patches" which she states provide "synthetic morphine" that "takes three months to get out of your system." (Devico Dep. p. 183, 189)

[6] An initial screen test can yield only two possible results: "negative" or "non-negative." (Defs' Ex. B8) At various places in the record, both Plaintiff and Defendant Hellmig use "non-negative" and "positive" interchangeably. (See, e.g., Devico Dep. p. 179, Hellmig Decl. ¶¶ 23, 25, 30)

[7] Genesis' "Substance Abuse and Alcohol Misuse Prevention and Testing Policy" states that "[a]n employee with a non-negative test result will be suspended pending final test result confirmation from the Medical Review Officer (MRO)." (Defs' Ex. A2)

Plaintiff leaving the Center with her car keys in hand. (Id.) In the parking lot, Ms. Golaszewski persuaded Plaintiff to allow her to drive her home. (Id.) "During the 10 minute car ride to [Plaintiff's] house, [Plaintiff] shared with [Golaszewski] that [Plaintiff] took medication for pain, but couldn't remember what it was, [Plaintiff] said 'I think one pill was flexaril.'" (Id.) Plaintiff "frequently repeated herself during [the] ride home." (Id.)

After Plaintiff had left the Center, Defendant Hellmig, Ms. Simuel, and Ms. Patel "reviewed [Plaintiff's] medication cart to ensure that [Plaintiff had] properly accounted for the residents' medications she distributed that day." (Hellmig Decl. ¶ 29; Defs' Ex. A5) The review revealed that Plaintiff "had not accounted for an Ativan, which is a benzodiazepine, and oxycodone-- two medications for which [Plaintiff] tested positive." (Hellmig Decl. ¶ 30) At that time, Defendant Hellmig decided that Plaintiff's "employment should be terminated." (Id. ¶ 31)

The following morning, Defendant Hellmig emailed Genesis' Regional Human Resources Manager, Natalie Hymson-Lentz, to report the circumstances under which Plaintiff had been suspended. (Defs' Ex. A3) Ms. Hymson-Lentz "advised [Defendant] Hellmig that Hellmig needed to wait for the MRO's review before taking further action regarding [Plaintiff's] employment." (DSUMF ¶ 73)

Defendant Hellmig then conducted an investigation of the incident, which included collecting written statements from Ms. Patel, Ms. Simuel, and Ms. Golaszewski. (DSUMF ¶ 70; Hellmig Decl. ¶ 37, Defs' Ex. A5) Defendant Hellmig also accepted documentation from Plaintiff, which included copies of Plaintiff's prescriptions for Xanax and oxycodone, among other medications[8], which Plaintiff produced for the MRO's review. (Hellmig Decl. ¶ 36, Defs' Ex. A4) It is undisputed that prior to June 9, 2014, Plaintiff had not discussed the oxycodone with her employer even though Genesis' "Substance-Free Policy" provides that "[a]ll [employees'] narcotic prescriptions must be discussed" with a supervisor (regardless of whether they may "impair [an employee's] ability to perform essential functions of the job effectively and safely"), and that failure to discuss with a supervisor "is proper cause for administrative or disciplinary action up to and including termination of employment." (Defs' Ex. A1)

Plaintiff also gave Defendant Hellmig two written, signed statements, both dated Tuesday, June 10, 2014, a day after the incident. (DSUMF ¶ 66) The first statement reads in its entirety,

> The day of Monday June 9, 2014 I became ill with extreme
> dizziness. I held onto the med cart and then locked it
> up. Going to advice [sic] the other nurse and was directed

---

[8] The photocopies of Plaintiff's prescriptions in the record are not entirely legible. It does not appear, however, that Plaintiff provided a prescription for the BuTrans she testified that she had used.

7

to downstairs.  Noted I had a B/P of 86/54.  Two meds were
taken prior to my working.  Toprol 50mg XR and Amrix XR.
Sincerely, Suzanne Devico

(Defs' Ex. B5)[9]

The second statement reads in its entirety,

I became ill and did not finish med pass properly.  I know
there are sign outs undone[10] and I take responsibility
however I did lock the cart up and keys were given.  I
deeply regret being ill.  Suzanne Devico

(Defs' Ex. B6)

It also appears that Plaintiff provided an after-visit summary

of her cardiologist appointment which she had on June 5, 2014-- four

days before the incident at issue.  (Defs' Ex. A6)  The summary,

apparently created by the cardiologist's office, states that

Plaintiff started taking Metoprolol at bedtime as a result of the

visit.  (Id.)  The summary also lists aspirin, Xanax, and Oxycodone

as "active medication."  (Id.)

On June 13, 2014, Defendant Hellmig provided to Ms. Hymson-

Lentz all of the documentation she collected during the

investigation.  (Defs' Ex. A6)  Four days later, on June 17, 2014,

the MRO reported Plaintiff's urine drug test as negative.

---

[9]  Plaintiff testified that she had taken Toprol and Amrix before
eating breakfast and reporting to work on June 9, 2014.  (Devico
Dep. p. 120)

[10]  Plaintiff testified that "if I give anybody a narcotic, I have to
sign it out [in the narcotic book] when it comes out of the drawer."
(Devico Dep. p. 124)  Plaintiff also testified that she knew "it was
imperative to follow the med pass documentation requirements," and
that not following the requirements "could lead to discipline." (Id.
p. 126-27, 129)

(Plaintiff's Ex. KK)  It is undisputed that the MRO reversed the
results of Plaintiff's initial non-negative drug test because
Plaintiff had provided prescriptions for each drug for which she had
tested positive.  (DSUMF ¶ 74)  In other words, the MRO's result was
"negative" because after the initial non-negative result, Plaintiff
had provided prescriptions which explained the presence of
benzodiazepine and oxycodone.

On June 23, 2014, Ms. Hymson-Lentz emailed Defendant Hellmig
the following:

Hi Lois,

I was (finally) able to obtain the final results of her drug test from Alere this afternoon.  The MRO
indicated it is Negative (the rep who had told me on the phone that she failed was clearly and
unfortunately mistaken).  They must have received her prescriptions and aligned them with what was found
in her urine sample.  Based on this and your investigation, what we can conclude is:

·    She made a documentation error in which she did not sign out narcotics.
·    She did not discuss her narcotic prescriptions with management per our policy.  Our substance
abuse policy says ' The need to take prescription medications that may impair the ability to perform the
essential    functions of the job effectively and safely should be discussed with the employee's
supervisor.  All narcotic prescriptions must be discussed.'
·    As a licensed nurse, came to work knowingly under the influence of drug(s) that could hinder her
job performance and, therefore, could put a resident in harm's way.

JP and I discussed and would like to proceed with termination based on the above bullets.    However,
before we do so, since there may be risk involved as she did pass the drug test and has since claimed she
is under medical care, I would like to confirm something on my end and circle back to you (hopefully
today and, if not, tomorrow).

Let me know if you any of you have information otherwise from the above.  I'll circle back asap.

Thanks,
Natalie

(Defs' Ex. A8)

Thereafter the Ms. Hymson-Lentz emailed someone else at
Genesis:

Hi Paul,

I was able to obtain the drug results for this LPN at Court House, Suzanne DeVico.    The results were negative.    They were non-negative and the preliminary results found narcotics in her system.    I assume the MRO reviewed her prescriptions and determined that they were aligned with what was found in her urine sample and deemed it negative.

The center still would like to term her.    She was tested under reasonable suspicion due to unusual behavior.    She also did not sign out narcotics that day, which also went missing.    The center cannot substantiate that they were stolen and the resident is not coherent to indicate whether or not she received these meds.

Suzanne worked for Court House several years and has a history of issues, although no previous documentation in her file.

What we can substantiate:
• She made a documentation error in which she did not sign out narcotics.

• She did not discuss her narcotic prescriptions with management per our policy.    Our substance abuse policy says '
The need to take prescription medications that may impair the ability to perform the essential functions of the job
effectively and safely should be discussed with the employee's supervisor.    All narcotic prescriptions must be
discussed.'

• As a LPN, came to work knowingly in a state in which she could not perform her job properly and could put a resident in
harm's way.

In the interim, as it has taken two weeks for her drug results, Suzanne has dropped off a note from her doctor putting
her out of work for medical reasons.    This could set us up for a claim.

I reviewed this with JP and he supports termination.    I would like to proceed as well based on the above bullets.    Your
input?

Thanks,
Natalie

(Plaintiff's Ex. AA[11])

The following day, Ms. Hymson-Lentz emailed Defendant Hellmig,
"We are ok to move forward with term for reasons bulleted [in
yesterday's email]." (Defs' Ex. A8) Defendant Hellmig then called
Plaintiff to tell her "that Court House Center was terminating her
employment." (DSUMF ¶ 78)

This lawsuit followed. Plaintiff's 10-count Amended Complaint
[Dkt No. 4] asserts the following claims: (1) discriminatory

---

[11] Plaintiff has attached the email to her opposition brief (as
opposed to a declaration or certification) and does not identify who
Paul Rickerhauser, the recipient of the email, is. The Court
assumes the internal Genesis email was provided to Plaintiff during
discovery.

termination in violation of the ADA; (2) failure to accommodate in violation of the ADA; (3) retaliation in violation of the ADA; (4) discriminatory termination in violation of the New Jersey Law Against Discrimination ("LAD"); (5) failure to accommodate in violation of the LAD; (6) retaliation in violation of the LAD; (7) hostile work environment in violation of the ADA; (8) aiding and abetting liability under LAD against Defendant Hellmig; (9) aiding and abetting liability under LAD against Defendant Kinder; and (10) defamation.

## II.  <u>Summary judgment standard</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law."  <u>Gonzalez v. Sec'y of Dept of Homeland Sec.</u>, 678 F.3d 254, 261 (3d Cir. 2012).  A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. <u>Id.</u>

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party.  <u>Melrose, Inc. v. City of Pittsburgh</u>, 613 F.3d 380, 387 (3d Cir. 2010).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  <u>Saldana v. Kmart</u>

Corp., 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Walsh v. Krantz, 386 F. App'x 334, 338 (3d Cir. 2010).

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." Connection Training Servs. v. City of Phila., 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." Id. In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord. Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC. v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment."). However, "the court need only determine if the

nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence does not need to be in admissible form at the time of summary judgment. FOP v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016).

## III. **Analysis**

### A. **Count 1-- Discriminatory termination in violation of the ADA**

For purposes of this motion only, Defendants assume that Plaintiff is able to satisfy her summary judgment burden of establishing a *prima facie* case of disability discrimination. Nonetheless, Defendants assert that they are entitled to summary judgment because they have provided legitimate, non-discriminatory reasons for terminating Plaintiff and Plaintiff has not come forward with evidence raising a fact issue as to whether those reasons were pretext for disability discrimination. The Court agrees.

"[T]he elements of the prima facie case and disbelief of the defendant's proffered reasons are the threshold findings, beyond which the jury is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1066-67 (3d Cir. 1996). Pretext may be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable [person] could rationally find them 'unworthy of credence,' and hence infer 'that the [defendant] did not act for

[the asserted] non-discriminatory reasons." <u>Fuentes v. Perskie</u>, 32

F.3d 759, 765 (3d Cir. 1994).

Plaintiff's argument that "there are genuine issues of material fact as to whether Plaintiff engaged in misconduct" (Opposition Brief, p. 27) is not supported by the record. The undisputed facts demonstrate that Plaintiff did fail to account for two drugs that were missing from her medication cart (on the same day that Plaintiff appeared herself to be intoxicated or otherwise impaired), and she did fail to "discuss" her own "narcotic prescriptions" with her employer as required by Genesis' policy.[12] Plaintiff provides no evidence from which a reasonable factfinder could conclude that

---

[12] Indeed, neither on the day Plaintiff fell ill, nor the next day in Plaintiff's written notes to her employer, did Plaintiff ever state that she had been prescribed narcotics. Rather, Plaintiff only disclosed that she had taken other, non-narcotic medications-- namely, Metoprolol / Toprol (Plaintiff's high blood pressure medication), and Amrix, which Plaintiff states is a muscle relaxant. (Devico Dep. p. 174; Defs' Ex. A6, B5)

Citing to her own deposition testimony, Plaintiff avers that she "was never given a copy of an employee handbook and would have no knowledge as to what policy would be contained in said handbook." (Plaintiff's response to Defendants' Statement of Undisputed Material Facts ¶ 5) However, Plaintiff only testified that she never received a paper copy of the policy; she did not testify that she did not know about the policy. (Devico Dep. p. 37, 50) Nonetheless, even assuming *arguendo* that Plaintiff did not know about the policy, there is no record evidence that Defendants were aware that Plaintiff did not know. Indeed, Plaintiff testified that Genesis had made an electronic copy of the handbook accessible by computer (though Plaintiff asserts she never tried to access it) (Devico Dep. p. 50), therefore, Defendants had reason to believe that Plaintiff did know of the policy.

either one of these failures independently-- much less together--
were not grounds for termination.[13]

Plaintiff further suggests that Genesis' internal emails of
June 23, 2014 are evidence of discriminatory animus.  The Court is
not persuaded.  Contrary to Plaintiff's suggestion, Ms. Hymson-
Lentz's statement that terminating Plaintiff "could set us up for a
claim" (Pl's Ex. AA), even when read in the light most favorable to
Plaintiff, is not an admission that Defendants discriminated against
Plaintiff.  An acknowledgement of the possibility that an employer
might face a legal "claim" after terminating an employee is not
tantamount to an admission that the employer discriminated against
that employee.

Similarly, no reasonable factfinder could find that the
statement, "[t]he MRO indicated [Plaintiff's test results are]
Negative (the rep who had told me on the phone that she failed was
clearly and unfortunately mistaken)" (Defs' Ex. A8), demonstrates
discriminatory animus.  Plaintiff argues that Defendants "were
looking for reasons to justify terminating [Plaintiff], [and] were

_____

[13]  Plaintiff argues that she "did not engage in any *voluntary*
'misconduct,'" (Opposition Brief, p. 30) (emphasis added), however,
there is no record evidence that the failure to properly document
narcotic medications that Plaintiff distributed, or the failure to
discuss Plaintiff's own prescription narcotics, must be found to be
voluntary before an employee may be terminated under Genesis'
policies.  While Plaintiff asserts that she did not *knowingly* arrive
to work impaired (Defendants' third of three proffered reasons for
Plaintiff's termination), Plaintiff does not argue that this issue
of fact calls into question Defendants' other two reasons for
terminating Plaintiff.

disappointed to find that [Plaintiff] passed the urine test."
(Opposition Brief, p. 22). Even assuming *arguendo* that a reasonable
factfinder could reach such a conclusion, it is insufficient to
raise a fact issue as to pretext because, when viewed in the context
of the entire record, the statement cannot support a finding of
discriminatory motive based on Plaintiff's alleged disabilities.

It is undisputed, and indeed, admitted, that "after discovering
[Plaintiff's] errors on June 9, 2014, [Ms. Hellmig] believed
[Plaintiff's] employment should be terminated." (Hellmig Decl. ¶
31) All of the record evidence supports only one conclusion as to
why that was so: Ms. Hellmig believed-- reasonably so, based on the
information gathered during Genesis' investigation-- that Plaintiff
was intoxicated on the job. While that belief may have ultimately
turned out to be mistaken[14], it is now well-established law that
merely proving that an employer was mistaken in its reasons for
termination is insufficient evidence of discriminatory motive. See
Capps v. Mondelez Glob., LLC, 847 F.3d 144, 155 (3d Cir. 2017) ("The
issue of pretext does not address the correctness or desirability of
reasons offered for employment decisions. Rather, it addresses the

---

[14] The Court notes that Ms. Hellmig's alleged mistake was caused, at
least in part, by Plaintiff's own failure to report her off-the job
use of narcotic medications. Indeed, the record evidence
demonstrates that, at the time Ms. Hellmig concluded that Plaintiff
should be terminated, Ms. Hellmig did not know that Plaintiff had
any disability. (Hellmig Decl. ¶ 45)

issue of whether the employer honestly believes in the reasons it offers.").

Accordingly, Defendants' Motion for Summary Judgment will be granted as to Count 1.

## B. Count 2-- Failure to accommodate in violation of the ADA

Defendants assert that no reasonable factfinder could find on this record that Plaintiff made a request for an accommodation. The Court agrees.

An employer must make reasonable accommodations to an employee's "known" disability. 42 U.S.C. § 12112(b)(5)(A). "What matters under the ADA are not formalisms about the manner of the request [for accommodation], but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability *and desire for an accommodation*." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999) (emphasis added); see also, Jones v. UPS, 214 F.3d 402 (3d Cir. 2000) (applying the Taylor standard to conclude that there was "no [record] evidence from which a request for accommodation could be inferred."). No reasonable factfinder could conclude on this record that Genesis could have been fairly said to have been on notice of Plaintiff's desire for an accommodation.[15]

_____

[15]  It is not entirely clear what reasonable accommodation Plaintiff asserts Genesis should have provided under the circumstances.  While

17

Plaintiff suggests that her communications with Genesis after the June 9th incident-- *i.e.*, during Genesis' investigation of the incident-- amount to a request for an accommodation. However, no reasonable juror could reach such a conclusion on this record. Plaintiffs' communications with Defendants included two brief written notes, both of which refer to Plaintiff falling "ill" on a particular day (rather than her having any sort of ongoing disability), and neither of which request that Defendants do anything as a result of Plaintiff's illness. Even viewed in the light most favorable to Plaintiff, the notes can only be interpreted as providing an explanation for Plaintiff's own behavior that occurred in the past, not any request that Defendants do anything in the future.

Similarly, to the extent Plaintiff testified that she provided Defendants with various, unspecified medical records concerning her

_____

Plaintiff argues that Defendants should have provided "time off to get tested to find out the source of her sudden illness" or "when [Plaintiff] suddenly fell ill, [Defendants] could have called 911," (Opposition Brief, p. 18, 21), she does not connect these proposed accommodations to any particular asserted disability. Indeed, Plaintiff's proposals do not appear to be accommodations at all, but rather suggested responses to what Plaintiff herself asserts is a singular incident of illness. (The Court notes that Plaintiff has not asserted a claim under the Family Medical Leave Act.) To the extent that Plaintiff separately proposes that Defendants should have "let her take certain prescriptions for her disability while not at work," (Opposition Brief, p. 22), the record demonstrates that Genesis' policy allowed such use of prescriptions.

previous health problems[16] (and medications she had taken for them) prior to Genesis taking over operations at Court House Center (Devico Dep. p. 147, 453), there is no record evidence that those documents were accompanied by any suggestion that Plaintiff needed an accommodation, or any request that Plaintiff's employer do anything with respect to Plaintiff's health conditions.[17] Indeed, Plaintiff clearly and specifically testified at her deposition that she "never spoke with [Defendant Kinder] or [Defendant Hellmig] or anyone at Genesis regarding any kind of accommodation [Plaintiff] needed in the workplace." (Devico Dep. p. 454-55) Thus, there is no record evidence from which a reasonable factfinder could conclude that Plaintiff communicated in any way her desire for an accommodation. The lone fact that Defendants may have been on notice of Plaintiff's various past health conditions is insufficient to raise a material issue of fact as to whether Plaintiff requested an accommodation in this case. See Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 332 (3d Cir. 2003) ("MBNA cannot be held liable for failing to read Conneen's tea leaves. Conneen had an obligation to truthfully communicate any need for an accommodation.").

---

[16] Plaintiff testified that those conditions include "chronic pain, hardware in my body from C-6 through T-1, and I am a former breast cancer patient." (Devico Dep. p. 147)

[17] There is record evidence that Plaintiff was provided an accommodation with regard to lifting patients. (Devico Dep. p. 453) There is no record evidence regarding how Plaintiff obtained the accommodation.

Defendants' Motion for Summary Judgment will be granted as to Count 2.

### C. Count 7-- Hostile work environment in violation of the ADA

As stated in Plaintiff's opposition brief:

[Plaintiff] alleges a hostile work environment based on: (1) Hellmig repeatedly telling Devico "she would not remember anything" and hanging up on her whenever Hellmig called her at work.[18] (2) Accusing [Plaintiff] of being intoxicated and coming to work intoxicated on June 9, 2014 even though this was not true and she had become suddenly and unexpectedly ill due to, as it turns out, to [sic] a recently increased dosage of her blood pressure, which [sic] she took for the first time the night before and had never experienced a reaction to before, (3) forcing [Plaintiff] to submit to an illegal drug test, even though [Plaintiff] told [Defendant] Hellmig she needed medical attention[19], thought she might be having a bad reaction to the blood pressure medication and had informed [Defendant] Hellmig that she takes certain medications when not at work for her disability, which would show up on the drug test. (4) not counting the pills in front of [Plaintiff] before she left to go to [Defendant] Hellmig's office, as she requested.[20] (5) Suspending [Plaintiff] for falsely accusing her of coming to work intoxicated, not

---

[18] Plaintiff provides no record citation in support of this statement. The Court's review of the record reveals no evidence for it. To the contrary, Plaintiff testified at her deposition, "I have nothing personal against Lois [Hellmig]. I barely know Lois. . . . The only time I really talked to Lois is when I was leaving [the Center on June 9, 2014]." (Devico Dep. p. 260, 432)

[19] Plaintiff provides no record citation in support of this statement. The Court's review of the record reveals only that Plaintiff asked Ms. Simuel "to take [Plaintiff's] blood pressure" and that Ms. Simuel did so. (Defs' Ex. A5)

[20] Plaintiff provides no record citation in support of this statement. The Court's review of the record reveals no evidence for the assertion that Plaintiff requested that the medication on her cart be counted.

completing her med pass and not signing out a narcotic for a patient, even though her sudden dizziness and nausea left her only able to lock up her cart and call for help. (6) Calling her "intoxicated" and humiliating her in front of other coworkers[21] (7) [Defendant] Hellmig telling the other employees the next day that [Defendant] Hellmig can fire anyone and Genesis will back her up[22] (8) Denying [Plaintiff's] request for medical assistance when she fell ill (9) Refusing to call 911 for [Plaintiff], and [Plaintiff] having to get a ride from another employee, who was a neighbor, who had also been told [Plaintiff] was intoxicated[23] (10) Forcing[24] [Plaintiff] to submit to an illegal urine test at work, when 911 should have been called instead so she could have a legal drug test at the hospital while

---

[21] Plaintiff provides no record citation in support of this statement. The Court's review of the record reveals no evidence for the assertion that Defendant Hellmig, or anyone else, used the word "intoxicated" to refer to Plaintiff in any context, much less in any communication with one of Plaintiff's coworkers.

[22] Plaintiff provides no record citation in support of this statement. It appears that it derives from the certification Plaintiff apparently submitted to the EEOC in connection with this case. The certification states in its entirety, "[t]he [Director of Nursing, Lois Hellmig] had a meeting [on June 10, 2014] saying she could fire anyone at any time and Genesis would back her up." (Pl's Ex. E)

[23] Plaintiff provides no record citation in support of this statement. It does not appear that anyone told Ms. Golaszewski that Plaintiff was "intoxicated." Ms. Golaszewski's statement, made in connection with Defendant Hellmig's investigation of the incident, states that Plaintiff told Golaszewski that "'someone says I'm acting funny.'" (Defs' Ex. A5) The statement does not contain the word "intoxicated"; rather, the statement reports observations that Ms. Golaszewski made of Plaintiff, including that Plaintiff had "sluggish," "slow," and "garbled" speech, and that Plaintiff "appeared very impaired" (id.)-- facts which Plaintiff does not dispute.

[24] Plaintiff testified, "A: [Defendant Hellmig] didn't ask me [to submit to a urine test.] She told me. . . . I did what I was told to do. Q: So you consented to the urine test, correct? A: Yes." (Devico Dep. p. 176)

at the same time getting medical attention for her illness. (11) suspending [Plaintiff] pending an investigation, (12) refusing to provide [Plaintiff] with any other accommodations she had requested and [sic] (13) terminating [Plaintiff] even though she ultimately passed the illegal drug test. (14) Terminating [Plaintiff] for intoxication and continuing to tell same [sic] to others, even though [Plaintiff] passed the drug test and intoxication was disproved by the other medical records provided by [Plaintiff].[25]

(Opposition Brief, p. 49) Plaintiff provides no legal analysis as to this claim.

To establish a hostile work environment claim under the ADA, Plaintiff must prove, among other things, that "she was subject to unwelcome harassment [that] was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment." Walton v. Mental Health Ass'n of S. Pa., 168 F.3d 661, 667 (3d Cir. 1999).

All of the allegedly hostile interactions *for which there is evidentiary support in the record*[26] occurred in connection with the

---

[25] To be clear, there is no record evidence that conclusively proves that Plaintiff was not intoxicated on June 9, 2014, when the urine test was administered. Plaintiff's medical records-- which include prescriptions for opioid medication (Defs' Ex. A4)-- obviously do not "disprove" any allegation that Plaintiff was intoxicated on June 9, 2014.

[26] As Plaintiff was repeatedly reminded at oral argument, this Court deals in evidence, not unsupported argument or speculation. Indeed, Fed. R. Civ. P. 11(b)(3) requires "factual contentions [to] have evidentiary support." Failure to faithfully adhere to this rule creates a terribly muddled record. As a result, this Court has labored to carefully comb the record to specifically identify-- as set forth above at notes 18 through 25-- which factual contentions have evidentiary support and which do not. Obviously, unsupported

single incident of Plaintiff's "illness" that occurred on June 9,
2014. Thus, a reasonable factfinder could not find on this record
that the challenged conduct was pervasive or frequent.
Additionally, the facts for which there are record support do not
establish that any of the asserted harassment was abusive or severe
under the circumstances of this case. Plaintiff was required to
submit to a urine drug test consistent with Genesis' policy for such
testing after Plaintiff undisputedly showed symptoms consistent with
intoxication: dizziness, vomiting, and inability to speak clearly,
according to Plaintiff's own testimony. (Devico Dep. p. 100) Thus,
a reasonable factfinder could not conclude that Defendants'
treatment of Plaintiff was severe enough to be actionable under a
hostile work environment theory. Accordingly, Defendants' Motion
for Summary Judgment will be granted as to Count 7.

**D.  Count 3-- Retaliation in violation of the ADA**

Plaintiff argues in her opposition brief that Plaintiff
"engaged in several instances of protected conduct . . . including
but not limited to asking for assistance and accommodation for her
disabilities." (Opposition Brief, p. 50) As set forth above, no
reasonable factfinder could find on this record that Plaintiff asked
for an accommodation for any of her asserted disabilities.

---

factual contentions cannot create a material issue of fact that
would preclude summary judgment. Plaintiff has made many factual
statements that are not supported by the evidence. It is
unfortunate, indeed.

Accordingly, Plaintiff has failed to establish a *prima facie* case of retaliation under the ADA.  Defendants' Motion for Summary Judgment will be granted as to Count 3.

### E. Counts 4-6, 8, and 9-10-- State law claims

"The district courts may decline to exercise supplemental jurisdiction . . . if-- . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The District Court "'must decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" <u>Stone v. Martin</u>, 720 F. App'x 132, 136 (3d Cir. 2017) (quoting <u>Hedges v. Musco</u>, 204 F.3d 109, 123 (3d Cir. 2000)).

The Court finds no affirmative justification for exercising supplemental jurisdiction over the remaining state law claims in this suit.  Indeed, considerations of judicial economy weigh *against* exercising supplemental jurisdiction in this case as there are more state law claims than federal law claims asserted.[27]

---

[27]  Similarly, considerations of judicial economy counsel in favor of preserving the scarce judicial resources currently available in this District.  With weighted filings of 903 cases per judgeship (the highest rate in the nation), the Judicial Conference of the United States has declared each of the current vacancies in the District of New Jersey to be a "judicial emergency."  In this district, 6 of the 17 allocated Article III judgeships are vacant and no nominees are currently pending.  <u>See</u> https://perma.cc/8CDJ-YJBF; <u>see</u> <u>also</u>, <u>Ford v. EF Explore Am., Inc.</u>, 2019 WL 3492211, at *6 (D.N.J. July 31, 2019) (McNulty, J.);  <u>Geraci v. Red Robin Int'l, Inc.</u>, 2019 WL

## IV. <u>Conclusion</u>

For the forgoing reasons, Defendants' Motion for Summary Judgment will be granted as to the ADA claims, and the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.  An appropriate order accompanies this opinion.

November 26, 2019

<u>  s/ Renée Marie Bumb  </u>
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

---

2574976, at *3 (D.N.J. June 24, 2019) (Bumb, J.); <u>Eddie Kane Steel Prod., Inc. v. Alabama Plate Cutting Co.</u>, 2019 WL 3281623, at *12 (D.N.J. July 19, 2019) (Shipp, J.).